**WESTERN LAND EXCHANGE PROJECT, a Washington nonprofit corporation; Central Oregon Forest Issues Committee, an Oregon nonprofit corporation; Wild Wilderness, an Oregon unincorporated association; and Sierra Club, Plaintiffs,**

v.

**Michael DOMBECK, Chief, U.S. Forest Service; Robert Williams, Regional Forester; and United States Forest Service, U.S. Department of Agriculture, Defendants,**

and

**Crown Pacific, L.P., Defendant–Intervenor,**

No. Civ. 98–1201–FR.

United States District Court, D. Oregon.

April 15, 1999.

Marianne Dugan, Western Environmental Law Center, Eugene, Oregon, for plaintiffs.

Kristine Olson, United States Attorney, Thomas C. Lee, Assistant United States Attorney, Portland, Oregon, Jocelyn B. Somers, Special Assistant United States Attorney, Office of the General Counsel, Portland, Oregon, for Federal defendants.

David A. Bledsoe, Perkins Coie LLP, Portland, Oregon, James R. Johnston, Galen G. Schuler, Perkins Coie LLP, Seattle, Washington, for defendant-intervenor.

## OPINION

FRYE, District Judge.

The matters before the court are 1) the motion for summary judgment filed by the defendant-intervenor, Crown Pacific, L.P. (# 112); 2) the motion for summary judgment filed by the federal defendants (# 115); 3) the motion for summary judgment filed by the plaintiffs (# 120); 4) the motion to amend complaint to add Sierra Club as plaintiff filed by the plaintiffs (# 137); 5) the motion for permanent injunction filed by the plaintiffs (# 147); and 6) the motion for order waiving bond filed by the plaintiffs (# 150).

## BACKGROUND

The plaintiffs, Western Land Exchange Project, Central Oregon Forest Issues Committee and Wild Wilderness (hereinafter referred to as the plaintiffs), filed this action against the defendants, the United States Forest Service (the Forest Service) and certain named officials of the Forest Service. The plaintiffs seek an order of the court enjoining the Forest Service and its employees from taking further action on the land exchange designated as the "USDA Forest Service/Crown Pacific Limited Partnership Land Exchange Project" (the Land Exchange Project) until the

Forest Service has prepared an adequate environmental impact statement.

The Land Exchange Project contemplates the exchange of 31,256 acres of land owned by the National Forest System for 34,319 acres of land owned by Crown Pacific, L.P. (hereinafter referred to as Crown Pacific). The plaintiffs allege that the Final Environmental Impact Statement prepared for the Land Exchange Project violates the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321–4370d; the guidelines of the Council of Environmental Quality implementing NEPA, 40 C.F.R. §§ 1500.1–1508.1; and the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. § 1716.

## UNDISPUTED FACTS

Between 1989 and 1990, comprehensive long-term Land Resource Management Plans were developed for the Deschutes National Forest, the Fremont National Forest, and the Winema National Forest.

The Land Resource Management Plan developed for the Fremont National Forest was incorporated by reference in the Landownership–Classification Plan approved by the Fremont Forest Supervisor on March 17, 1980. The objectives of this Land Resource Management Plan were to identify private lands suitable for National Forest purposes and to determine which public lands should be retained, added to, or deleted from the National Forest System Lands in order to achieve an optimum ownership pattern. AR 13.

The Land Resource Management Plan for the Deschutes National Forest includes a land adjustment map which displays the lands considered desirable for inclusion in the National Forest System Lands and the lands available for exchange. AR 18.

The Land Resource Management Plan for the Winema National Forest includes a land adjustment objective of achieving the optimum ownership pattern. The Forest Plan direction is to acquire and dispose of these lands as necessary to facilitate exchanges. AR 22.

Discussions took place in 1989 between Crown Pacific and the Forest Service concerning the feasibility and the desirability of a proposed 11,000 acre land exchange in the Deschutes National Forest. Discussions with regard to the proposed land exchange were suspended because the Forest Service lacked the resources to undertake the necessary land exchange analysis.

In August of 1993, the Forest Service implemented an "Interim Approach for Sale Preparation, Eastside Forests," otherwise known as "the Eastside Screens," which apply to the preparation of timber sales in specified National Forests including the Deschutes, the Fremont, and the Winema Forests. AR 151. The Eastside Screens were to remain in effect until additional long-term planning for the Eastside forests was completed. The Eastside Screens have been updated twice by the Forest Service, and continue to prohibit all timber sales within late and old structural forest stands that are below an historic range of variability. The Eastside Screens require that there be no net loss of late and old structural forest stands and prohibit logging of all trees over 20″ diameter at breast height. AR 357–377, 718. The Forest Service did not apply the Eastside Screens to the Land Exchange Project, explaining in its responses to public comments to the Draft Environmental Impact Statement that "[t]he Eastside Screens do not apply to land exchanges." AR 6453, Appendix G at 34.

The Eastside Forests Scientific Society Panel (the Panel) was convened in 1993 at the request of congressional members from both major political parties to examine the health of the forest lands on the east side of the Cascade Mountains. In "A Report to the Congress and President of the United States," the Panel concluded that "all remaining LS/OG [late-successional/old-growth] blocks and fragments are ecologically significant." Plaintiffs' Exhibits in Support of Motion for TRO and Preliminary Injunction, Exhibit L at

11. The Panel recommended that the federal government halt logging of all Eastside LS/OG forests and all individual trees older than 150 years or larger than 20 inches in diameter as an interim measure in order to "protect [ ] the resources remaining on the Eastside until, and only until, a long-term strategy of protection and restoration can be developed." *Id.* at 10. The Panel found that "[f]urther reduction in LS/OG is likely to jeopardize many components of the biological diversity of eastside forests and increase numbers of threatened, endangered, and extinct species, ..." *Id.* at 7. The Panel further found that "[p]rotecting ponderosa pines must be a high priority independent of the size of the patch where the trees are located." *Id.* at 13.

In February of 1994, in order to accomplish their long-term planning goals, the Forest Service and the Bureau of Land Management proposed a strategy for the development of coordinated ecosystem management in public lands east of the Cascade Mountains in the States of Oregon and Washington. In order to develop this strategy, these agencies began the preparation of an environmental impact statement for forests and public lands east of the Cascade Mountains in the States of Oregon and Washington in order to "develop and adopt a coordinated ecosystem management strategy." 59 Fed.Reg. 4680 (1994). This coordinated ecosystem planning strategy became known as the Interior Columbia Basin Ecosystem Management Project.

Land exchange discussions resumed in 1994 between Crown Pacific and the Forest Service. In December of 1994, the Deschutes National Forest, the Fremont National Forest, and the Winema National Forest entered into a Memorandum of Understanding with Crown Pacific, each entity thereby recognizing that the long-term objectives are such that the public interest is better served through consolidated ownership patterns. The mutual objective of the Forest Service and Crown Pacific in the examining of a particular land exchange was to improve the efficiency and effectiveness in the administration of their respective lands. AR 499.

On June 7, 1995, an "Agreement to Initiate" the identification of the lands to consider for a proposed land exchange was signed by the Regional Forester and by Crown Pacific. AR 719–723. The proposed land exchange project appeared in the Schedule of Proposed Actions for the Deschutes National Forest, the Fremont National Forest, and the Winema National Forest. AR 818, 819 and 1191. The Forest Service published legal notices identifying all parcels of land proposed for exchange. AR 927, 935, 942 and 967. The Forest Service began consultations with Indian Tribes relating to the proposed land exchange. AR 1040, 1041, 1042 and 1048.

Crown Pacific contracted with Dean Carrier & Associates to complete a preliminary analysis of the proposed land exchange in order to determine the general feasibility of the exchange and to identify environmental issues. In June of 1996, Crown Pacific contracted with Dean Carrier & Associates to complete an environmental assessment, which was to include public involvement, the collection of cultural and biological data, and further evaluations. The Forest Service issued a three-forest news release titled "Land Exchange Environmental Analysis Begins." AR 1871. Public meetings were held. The Forest Service mailed scoping letters to interested and affected members of the public. AR 2374.

On October 5, 1996, Dean Carrier & Associates submitted a working draft of an environmental assessment to Crown Pacific and the Forest Service for review. AR 2454. The Forest Service created the Three–Forest Crown Land Exchange Advisory Board (the Advisory Board) to comment on the working draft of the environmental assessment and to identify the key issues and concerns to track throughout the process of environmental analysis. On November 19, 1996, the Forest Service sent a letter to Crown Pacific stating that

the key issues were old growth allocations, late and old structural forest stands, mule deer winter range, and sensitive plants. AR 2851–2855. After meetings between the Advisory Board and Crown Pacific, the Advisory Board reduced the amount of land in the proposed exchange by eliminating parcels of old growth, areas of sensitive plants, and mule deer winter ranges. AR 3381. Representatives of the Forest Service and Crown Pacific continued to meet and discuss proposals.

On June 20, 1997, Dean Carrier & Associates completed a draft of the Environmental Assessment for the Land Exchange Project. AR 3970. The Forest Service reviewed the draft of the Environmental Assessment, and thereafter the Forest Supervisors from the three national forests involved in the proposed land exchange decided that it was necessary to prepare an environmental impact statement. AR 4457.

In April of 1997, the Forest Service and the Bureau of Land Management released the Draft Eastside and Upper Columbia River Basin Environmental Impact Statement for the Interior Columbia Basin Ecosystem Management Project. The Forest Service and the Bureau of Land Management later announced that they would issue a Supplemental Draft Environmental Impact Statement for the Interior Columbia Basin Ecosystem Management Project for public comment. Exhibit Z to Plaintiffs' Memorandum in Support of Motion for Summary Judgment.

In August of 1997, an initial Forest Service Interdisciplinary Team met to begin the process of completing a draft of an environmental impact statement for the Land Exchange Project. AR 4521. In September of 1997, a public meeting was held in LaPine, Oregon to update citizens interested in the land exchange proposal. AR 4740.

The Forest Service Interdisciplinary Team prepared a draft of an environmental impact statement for the Land Exchange Project for internal review. On November 7, 1997, the Draft Environmen-

tal Impact Statement for the Land Exchange Project was completed and released to the public. AR 5508. The Draft Environmental Impact Statement contained a detailed analysis of the "Proposed Action" and the "No Action" alternatives. A Notice of Availability of a 60-day comment period was published in the Federal Register on November 14, 1997. AR 5591. The Draft Environmental Impact Statement contained a statement of the "Purpose of and Need for Action" as follows:

The purpose of this proposed land exchange is to consolidate land ownership and enhance future resource conservation and management by exchanging parcels of NFS and Crown Pacific lands. The lands considered for exchange consist of approximately 32,936 acres of NFS lands for approximately 38,745 acres of Crown Pacific lands.

The desired condition for NFS lands is large consolidated blocks which will provide for efficient and effective conservation and management of natural resources. Currently, lands proposed for trade are characterized by irregular boundaries and isolated small parcels.

Efficiencies are realized by reducing boundaries requiring survey and maintenance, reducing amounts of joint-use roads, easements, and agreements necessary to access inholdings. Effective conservation and management of natural resources can be realized by increasing the contiguous land base (ecosystem) where consistent objectives may be applied and increasing ownership of important riparian and wetland areas or unique wildlife and fisheries habitats.

Crown Pacific land management objectives are benefited by reducing costs and improving efficiencies associated with timber land management. Cost reductions can be realized by reducing the amount of joint-use roads and boundary maintenance associated with the management of inholdings. Reducing the amount of NFS inholdings would allow

Crown Pacific to more effectively manage their road systems.

AR 5508 at 5.

On November 20, 1997, another public meeting was held in LaPine, Oregon to facilitate public input on the Land Exchange Project. AR 5621. An additional follow-up public meeting was held at a location in the Deschutes National Forest. AR 5808.

On January 9, 1998, the Oregon Department of Fish and Wildlife (ODFW) submitted comments to the Draft Environmental Impact Statement. ODFW officials expressed concerns about the following aspects of the Land Exchange Proposal:

1) Loss of Late and Old Structure (LOS) ponderosa pine habitat....

2) Loss of big game habitat values in the Bull and Dorrance subwatersheds through private timber practices or residential development....

3) Increase in road densities resulting in loss of mule deer habitat, loss of mule deer through poaching, reduced mule deer escapement and survival, reduced habitat effectiveness, increased forest fragmentation, and ultimately reduced recreational use....

4) Loss of wildlife habitat in general due to less vegetative vertical structure, snags, and down woody material on Crown Pacific lands, along with more habitat fragmentation caused by roading....

AR 6000–6001.

ODFW recommended that "the exchange plan [ ] result in no net loss of LOS ponderosa pine habitat and connectivity function[; that there be] no loss of big game habitat values in the Bull and Dorrance subwatersheds[; and that] Crown Pacific effectively reduce road densities to the Land Resource Management Plan (LRMP) target level of 2.5 miles per section before the trade." *Id.* at 6001. The ODFW Regional Supervisor concluded:

Overall, we acknowledge that the FS is in the unenviable position of making some tough decisions that will affect how they manage their forests in the future. These decisions will determine how effective they can be at maintaining species viability and how they can provide for future needs.

However, ODFW has a number of concerns with these proposed decisions. The loss of remnant parcels of LOS ponderosa pine that also function as an LOS connectivity corridor is a key concern. Loss of critical mule deer winter range, loss of quality big game habitat along the Little Deschutes River, and increased road densities are additional concerns. While the loss of wildlife habitat integrity, in particular the large tree and snag components, is also a concern.

AR 6004.

On January 9, 1998, the United States Environmental Protection Agency (EPA) submitted comments to the proposed land exchange analyzed in the Draft Environmental Impact Statement. EPA officials stated that "[w]hile we recognize that consolidating federal land ownership can improve administration and sometimes ecological function we believe that the potential adverse ecological and water quality effects of the proposed land transfer substantially outweigh the presumed benefits." AR 6006. EPA officials concluded that "[t]he loss in old growth and the associated impact to biodiversity, water quality, and recreation are of such significance as to warrant further examination." AR 6005. EPA officials stated that "[i]t is not clear how this land exchange benefits the public when one considers the potentially huge environmental impacts to the land the FS is exchanging, the fact that the land they are receiving is fully timbered, heavily roaded, and in uncertain condition, and that the public will have to sustain the costs of rehabilitating the lands." AR 6007–6008. EPA officials concluded that the Draft Environmental Impact Statement was inadequate, and a supplemental Draft Environmental Impact Statement should be prepared before going forward with the Final Environmental Impact Statement. AR 6009.

Over 1,000 individuals and organizations submitted comments to the Draft Environmental Impact Statement. AR 6453, Appendix G. The comment period for the Draft Environmental Impact Statement closed on January 9, 1998.

After analyzing the public comments, including the comments of the ODFW and the EPA, the Forest Service prepared responses to the public comments and modified the Draft Environmental Impact Statement, thereby addressing additional issues relating to the late and old structural timber stands, wildlife, recreation, scenic, aesthetic and socioeconomic issues raised. AR 6453, Appendix G.

On January 15, 1998, a meeting was held with officials from the ODFW to address comments on old growth habitat and late and old structural timber stands. AR 6077.

On February 27, 1998, the three national forests issued a Final Environmental Impact Statement on the Land Exchange Project. AR 6452. The Proposed Action in the Final Environmental Impact Statement includes the exchange of approximately 32,936 acres of National Forest System lands for approximately 38,745 acres of land owned by Crown Pacific. The Final Environmental Impact Statement explains:

> The purpose of this proposed land exchange is to consolidate land ownership and enhance long-term resource conservation and management. This purpose can be achieved by acquiring key parcels to meet specific resource needs, reducing intermingled ownerships, reducing the amount of urban/wildlife interface, and reducing the number of inholdings (small parcels of land of one ownership surrounded by lands of different ownership) by exchanging parcels of NFS lands for Crown Pacific lands. Currently, lands proposed for trade are characterized by intermingling ownerships, irregular boundaries, and inholdings.
>
> Areas that are desirable for inclusion in the NFS include: lands along the Little Deschutes River, Tumalo Creek, and the South Fork of the Sprague River (currently under consideration for inclusion in the Wild and Scenic River System); lands surrounding Corral Springs; Moffit Butte (an unusual geologic area with scenic qualities along U.S. Highway 31); and lands within the Fort Rock, Metolius, and Tumalo mule deer winter ranges. Areas that are not desirable for inclusion in the NFS typically include isolated parcels situated away from contiguous blocks of federal land.
>
> The desired condition for NFS lands is large consolidated blocks which will provide for efficient and effective conservation and management of natural resources. Large, consolidated blocks will also help minimize administrative costs. Efficiencies are realized by reducing boundaries requiring survey and maintenance, reducing amounts of joint-use roads, reducing the number of easements and the number of agreements necessary to access inholdings. The current intermingled ownership pattern has made it necessary for both the Forest Service and large private timber company landowners to exchange rights-of-way and enter into shared road systems.
>
> The current intermingled ownership pattern has considerable effect on NFS management. Contrasting management practices on private land influence resource management efforts on NFS lands and often reduces the ability to apply ecosystem management principles across the landscape. Effective conservation and management of natural resources can be realized by increasing the contiguous land base (ecosystem) where consistent objectives may be applied, and increasing ownership of important riparian and wetland areas or wildlife and fisheries habitats. Large areas of intermingled ownership currently exist in Klamath and Lake Counties. These areas are generally east of U.S. Highway 97 and south of U.S. Highway 31.

AR 6452 at 4.

On this same date, February 27, 1998, the supervisors of the three national for-

ests signed the Record of Decision for the Land Exchange Project selecting the Proposed Action Alternative, with certain modifications identified in the Record of Decision, including retention of Tumalo Reservoir/Bull Springs lands and allocation of additional areas to Old Growth Management. AR 6451 at 4–10. *See* Map 1 and Map 2 attached to this Opinion. After the modifications to the proposed action, the resulting action provides for the exchange of 31,256 acres of land owned by the National Forest System for 34,319 acres of lands owned by Crown Pacific. This exchange of lands includes parcels of National Forest System lands that are surrounded by Crown Pacific lands, parcels of Crown Pacific lands that are surrounded by National Forest System lands, and parcels of land with irregular edges separating Crown Pacific lands from National Forest System lands. The Winema National Forest, while not offering lands for exchange, would thereby receive lands currently owned by Crown Pacific.

The public parcels included in the land exchange include more than 4,770 acres of Late and Old Structure (LOS) forest stands. These LOS forest stands include lodgepole pine (740 acres), ponderosa pine (4,017 acres), and mixed conifer (13 acres). AR 6452 at 30–31. The Final Environmental Impact Statement states: "On a landscape scale, the direct effect of the Proposed Action is a net loss in public ownership of LOS ponderosa pine (3,793 acres); a net loss in public ownership of LOS lodgepole pine (676 acres); and a net gain in public ownership of LOS mixed conifer (441 acres)." AR 6452 at 33.

The Record of Decision explains:

The land exchange process recognizes that even though all lands within the National Forest System provide some public benefit, not all parcels provide equal benefits. For example, large blocks of contiguous habitat serve as better habitat than smaller, fragmented pieces. As we approached this exchange, we focused on trading out lands that—because of widely different management objectives on adjacent lands— do not provide more than fragmented pieces of habitat. Recognizing that these lands do offer a refuge within private lands, this is a trade-off that needed to be considered and weighed over the long term.

We have chosen the Proposed Action Alternative, as modified, over the other alternatives because it best approximates the purpose and need, while providing for a balance of social and resource conservation considerations. In addition to the purpose and need and reasons identified above, we can point to concrete benefits to be realized in our decision including: a) the addition of approximately 4,352 acres of allocated old growth across the project area, which allow us to provide for habitat for old growth associated species in the long term; b) the addition of approximately 18.2 miles of perennial and intermittent streams including consolidation of the entire upper watershed containing Tumalo Creek; c) the inclusion of more than 500 acres of riparian and wetlands, including three meadow complexes and a seasonal lake in the southeast portion of the project area[;] and d) an increase of over 6,000 acres of mule deer winter range; a decrease in joint boundaries of 170 miles or a 35% reduction in joint boundaries.

AR 6451 at 7.

Legal notices of the decision were published on March 25, 1998, thereby beginning the 45–day appeal period. AR 6611.

On March 27, 1998, the Notice of Availability of the Final Environmental Impact Statement appeared in the Federal Register. AR 6618. The appeal period closed on May 11, 1998. On or about May 11, 1998, the plaintiffs submitted an administrative appeal of the decision to defendant Robert Williams in his capacity as the Regional Forester of the United States Forest Service. AR 6664. That appeal was denied on or about August 7, 1998. AR 6778. The Regional Forester re-

viewed and upheld the decision of the Forest Supervisors. AR 6806.

On July 6, 1998, an appraisal of the 35,283.02 acres of land owned by Crown Pacific involved in the Land Exchange Project was forwarded to Crown Pacific. AR 6644. On that same date, July 6, 1998, an appraisal of the 31,220.79 acres of land owned by the Forest Service involved in the Land Exchange Project was forwarded to the Forest Service. AR 6645. Each of the appraisals showed that the estimated market value of the parcels of land proposed for exchange as of April 27, 1998 was $39,200,000. AR 6644, AR 6645.

The appraisal showed that the timber on land owned by Crown Pacific to be exchanged to the Forest Service was 48.6% mature ponderosa pine, 19.2% young ponderosa pine, 21.0% lodgepole pine, and 10.6% white fir. AR 6644. The appraisal showed that timber on land owned by the Forest Service to be exchanged to Crown Pacific was 43.2% mature ponderosa pine, 19.6% young ponderosa pine, 31.4% lodgepole pine, and 4.3% white fir. AR 6645. Crown Pacific lands to be conveyed to the United States contain roughly 110 million board feet of timber, constituting 82% of the value of the contribution of Crown Pacific to the land exchange. AR 6644. Forest Service lands to be conveyed to Crown Pacific contain roughly 117 million board feet of timber, constituting 87% of the appraised value of the contribution of the federal lands to the land exchange. AR 6645. To equalize the higher timber volume on federal lands conveyed to Crown Pacific, Crown Pacific was to convey a large total acreage and valuable riparian lands to the Forest Service in the exchange.

On September 25, 1998, the Chief of the Forest Service upheld the Record of Decision of the Forest Supervisors.

On August 14, 1998, the land exchange agreement was signed.

## CONTENTIONS OF THE PLAINTIFFS

The plaintiffs contend that the Final Environmental Impact Statement does not adequately disclose the impacts of the land exchange on the following environmental issues: 1) the loss of late successional and old growth and ponderosa pine timber stands and the associated wildlife species and habitat, 2) sensitive plant species, 3) the property rights of adjacent landowners, 4) public access, and 5) recreational and real estate values.

The plaintiffs contend that the Final Environmental Impact Statement violates NEPA by considering only one alternative other than the "No Action" alternative and by authorizing the land exchange prior to the completion of the Eastside Environmental Impact Statement which the Forest Service and the Bureau of Land Management are currently preparing pursuant to the Interior Columbia Basin Ecosystem Management Project.

In addition, the plaintiffs contend that the defendants violated FLPMA by failing to adequately analyze the factors required in order to determine whether the land exchange is in the public interest.

## CONTENTIONS OF THE FOREST SERVICE

The Forest Service contends that the decision to enter into the land exchange complies with NEPA and FLPMA in every way. The Forest Service contends that the Final Environmental Impact Statement adequately analyzes the effects of the land exchange on all aspects of the environment, including 1) old growth and late and old structure stands; 2) wildlife using old growth and late and old structure stands; 3) fish and wildlife; 4) sensitive plants, water quality, streams, and wetlands; 5) the condition of the land conveyed by Crown Pacific in the exchange; 6) the impacts to the local economy, land development and adjacent landowners; 7) public access and recreation; and 8) the cumulative impacts upon the environment.

The Forest Service contends that the Final Environmental Impact Statement considers and analyzes a reasonable range of alternatives; that the decision to enter into the land exchange tiers to existing Forest Plans; and that the Forest Service is authorized to proceed with the land exchange unconstrained by the pending draft environmental impact statements for the eastside forests pursuant to the Interior Columbia Basin Ecosystem Management Project.

## CONTENTIONS OF CROWN PACIFIC

Crown Pacific contends that the decision of the Forest Service to approve the land exchange complies with NEPA and FLPMA in every respect. Crown Pacific contends that the Forest Service has taken a hard look at each of the issues raised by the plaintiffs in this case and made a reasonable decision to go forward with the land exchange. Crown Pacific further contends that the Forest Service considered and analyzed a reasonable range of alternatives in the Final Environmental Impact Statement.

## APPLICABLE LAW

FLPMA provides that public lands may be exchanged "where the Secretary concerned determines that the public interest will be well served by making that exchange: *Provided,* That when considering public interest the Secretary concerned shall give full consideration to better Federal land management and the needs of State and local people, including needs for lands for the economy, community expansion, recreation areas, food, fiber, minerals, and fish and wildlife and the Secretary concerned finds that the values and the objectives which Federal lands or interests to be conveyed may serve if retained in Federal ownership are not more than the values of the non-Federal lands or interests and the public objectives they could serve if acquired." 43 U.S.C. § 1716(a).

NEPA requires federal agencies to prepare an environmental impact statement for "every recommendation or report on proposals for legislation and other ma-jor Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). NEPA requires the government to disclose and take a "hard look" at the foreseeable environmental consequences of its decision, and the reasonable alternatives to that decision. *Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976).

NEPA "ensures that the agency ... will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger [public] audience...." *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). In *Robertson,* the United States Supreme Court explained:

> [I]t would not have violated NEPA if the Forest Service, after complying with the Act's procedural prerequisites, had decided that the benefits to be derived from downhill skiing at Sandy Butte justified the issuance of a special use permit, notwithstanding the loss of 15 percent, 50 percent, or even 100 percent of the mule deer herd. Other statutes may impose substantive environmental obligations on federal agencies, but NEPA merely prohibits uninformed—rather than unwise—agency action.

*Id.* at 351, 109 S.Ct. 1835 (footnote omitted).

The court reviews the decision of the Forest Service under the Administrative Procedure Act (APA) "by scrutinizing the administrative record at the time the agency made its decision." *Asarco, Inc. v. EPA,* 616 F.2d 1153, 1159 (9th Cir.1980). The "whole" administrative record consists of all documents and materials directly or indirectly considered by agency decision-makers. *Thompson v. United States Dep't of Labor,* 885 F.2d 551, 555 (9th Cir.1989).

The standard of review of agency actions concerning NEPA is the "arbitrary and capricious" standard specified by 5

U.S.C. § 706(2)(A). *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 376, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). "[A] district court's review of an environmental impact statement is principally governed by the APA, 5 U.S.C. § 706(2)(D)." *Salmon River Concerned Citizens v. Robertson,* 32 F.3d 1346, 1356 (9th Cir.1994). "Thus, the environmental impact statement review standard is limited and decidedly deferential to the agency's expertise." *Id.*

"[U]nder this Circuit's 'rule of reason,' the district court must determine 'whether the [impact statement] contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences' by making 'a pragmatic judgment whether the [impact statement's] form, content and preparation foster both informed decision-making and informed public participation.'" *Id.,* quoting *California v. Block,* 690 F.2d 753, 761 (9th Cir. 1982).

In *City of Los Angeles v. Federal Aviation Admin.,* 138 F.3d 806, 807 (9th Cir. 1998), the United States Court of Appeals for the Ninth Circuit explained:

> When reviewing an environmental impact statement, it doesn't matter whether we agree with the agency's conclusions. Rather, the EIS acts as a procedural safeguard: Drafting a statement, one hopes, will force an agency to consider a project's effects on the environment. If the agency discusses the main environmental effects reasonably thoroughly, that's enough.... Our task is to determine whether the agency has taken a "hard look" at the environmental effects. (Citation omitted).

## ANALYSIS

1. *Adequacy of the Final Environmental Impact Statement*

The stated purpose of the land exchange throughout the environmental analysis process has been to consolidate Forest Service lands and to eliminate irregular boundaries and isolated small parcels in order to enhance long-term conservation and management of natural resources.

The proposed action meets this purpose by eliminating over 300 miles of joint boundaries and the need for joint management of over 200 miles of roads. AR 6453 at 120. The Forest Service achieves consolidation of large blocks of publicly-owned lands, thereby eliminating private inholdings within these large blocks of lands. *See* Map 1 and Map 2 attached to this Opinion. The Forest Service acquires over 6,000 acres of mule deer winter range, 18.2 miles of perennial and intermittent streams, and over 500 acres of wetlands and riparian areas. The Forest Service increases total ownership of public lands by 4,062 acres. The Forest Service allocates 4,352 additional acres to be managed as old growth forests in the Deschutes and Fremont National Forests.

The Forest Service candidly admits that "the FEIS reveals, that this exchange is a 'tradeoff,' which, although beneficial in the long term, nonetheless has some significant detrimental environmental impacts." Federal Defendants' Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment, p. 13, quoting Record of Decision at 7. It does not matter whether the court agrees with the Forest Service that the long-term benefits of the land exchange are worth the significant detrimental impacts. *City of Los Angeles,* 138 F.3d at 807. The issue before the court is whether the Forest Service in the Final Environmental Impact Statement discloses to the public and takes a hard look at the foreseeable environmental consequences of its decision to engage in the land exchange, and the reasonable alternatives to that decision.

A. *Loss of LOS Timber Stands and Associated Wildlife Habitat*

■ The plaintiffs contend that the proposed land exchange violates NEPA because the Forest Service has failed to disclose the foreseeable impacts from the net loss of over 4,000 acres of Late and Old

Structure (LOS) trees and ponderosa pine forest stands, along with their associated wildlife migration corridors and other wildlife habitat. The plaintiffs point to the fact that the Final Environmental Impact Statement acknowledges that the "[l]ands acquired by [Crown Pacific] are expected to be intensively managed for timber production," which will result in "reduced distribution and abundance of LOS habitats for some associated wildlife species." AR 6452 at 36. The plaintiffs contend that the Final Environmental Impact Statement does not analyze or acknowledge the impacts from the loss of these LOS forest stands.

The plaintiffs contend that the Final Environmental Impact Statement does not disclose or take into account recent scientific research indicating that the Eastside LOS forest stands, especially ponderosa pine forests, are in dire ecological condition, and are fragmented to such an extent that all remaining stands—even small stands—are of critical importance. The plaintiffs point specifically to the Eastside Forests Scientific Society Panel convened in 1993, which found that "only a fraction of the original old-growth forest in eastern Oregon and Washington remains," Plaintiffs' Exhibits in Support of Motion for TRO and Preliminary Injunction, Exhibit L at 11, and that "[f]urther reduction in LS/OG forest is likely to jeopardize many components of the biological diversity of eastside forests and increase numbers of threatened, endangered, and extinct species." *Id.* at 7.

The plaintiffs contend that the Final Environmental Impact Statement fails to address the importance of refugia provided to wildlife by the isolated, fragmented parcels of LOS forest stands that the Forest Service proposes to exchange for Crown Pacific lands. The plaintiffs point to the recommendation of the ODFW that the Forest Service modify the exchange to provide no net loss of LOS habitat and connectivity function. AR 6000. While the Final Environmental Impact Statement acknowledges that the now-public lands are expected to be logged once they

are privatized, the plaintiffs contend that the Final Environmental Impact Statement fails to adequately address the impact of such logging on LOS forests and on the wildlife species supported by these LOS forest stands.

The Forest Service contends that the effects of the land exchange on old growth forests and LOS forest stands have been key environmental issues throughout the land exchange process. The Forest Service contends that 1) early in the land exchange process, several old growth management areas in the Fremont National Forest were removed from consideration in the exchange; 2) that the Deschutes National Forest completed a forestwide LOS mapping project in 1997; and 3) that the Forest Service has allocated an additional 4,352 acres of Forest Service lands to be managed as old growth forests as a part of the land exchange action.

The defendants contend that the report of the Eastside Forests Scientific Society Panel is not a part of the administrative record and cannot be considered in this case. The Forest Service contends that it weighed the loss of LOS timber stands in fragmented and isolated locations surrounded by Crown Pacific lands with the long-term benefits to the Forest Service of the consolidation of these lands. The Forest Service points out that the Final Environmental Impact Statement recognizes that the "scattered distribution of LOS stands across the landscape would provide biological diversity, serve as refugia, and facilitate the dispersal of LOS associated species." AR 6452 at 29. However, the Final Environmental Impact Statement further recognizes that a pattern of scattered ownership and the harvest of timber on LOS stands now owned by Crown Pacific "would continue to fragment LOS stands and reduce the connectivity of these habitats." AR 6452 at 30.

The Forest Service contends that the Record of Decision acknowledges that this exchange is a tradeoff, which, although beneficial in the long-term, nonetheless

has some significant short-run detrimental environmental impacts. The Forest Service contends that consistent with NEPA, after taking a hard look at the environmental impacts of its proposal, the Forest Service can thereafter decide to incur the short-run detrimental environmental impacts notwithstanding the strongly held opinions of its opponents.

The report of the Eastside Forests Scientific Society Panel was relied upon by the plaintiffs in their appeal of the Record of Decision filed on May 11, 1998. AR 6672, 6675, 6678–6679. The appeal was late in the process, but the report of the Eastside Forests Scientific Society Panel is a document very familiar to the Forest Service. The report referred to by the plaintiffs in their appeal was directly or indirectly considered by the Regional Forester in the appeal and is properly part of the administrative record. Thompson, 885 F.2d at 555.

The impact of the proposed land exchange on LOS and ponderosa pine timber stands and the wildlife associated with LOS timber stands was identified as a key issue from the initiation of the environmental analysis of the land exchange. AR 986. In February of 1996, early in the exchange process, several old growth management areas were removed from consideration as a part of the land exchange. AR 1225. Within the process of analyzing the land exchange, the Deschutes and Fremont National Forests completed detailed analyses in order to determine the exact acreage and location of the old growth forests and the LOS stands that would be exchanged to Crown Pacific. AR 2967, 2970–2972, 3006. The Environmental Assessment and the Draft Environmental Impact Statement consider in detail the quantity of federal old growth forests and LOS lands involved in the exchange and were the subject of extensive public comment. AR 3970, 5508. The Final Environmental Impact Statement describes in detail the loss of LOS timber stands contemplated by the land exchange and the effects of this loss. AR 6452.

Based upon the information developed throughout the process of evaluating the land exchange, the Forest Service determined that the federal LOS and ponderosa pine timber stands exchanged to Crown Pacific were not essential to the long-term objectives of the Forest Service because the Forest Service lands involved in the exchange consisted of relatively small stands of LOS and ponderosa pine in fragmented and isolated locations surrounded by Crown Pacific lands. This information was made public through the Draft Environmental Assessment, the Draft Environmental Impact Statement and the Final Environmental Impact Statement. The Final Environmental Impact Statement states, in part:

> The indirect effects of the Proposed Action would be the adoption of different management strategies for lands included in the exchange. Management direction for lands acquired by the NFS would be provided by Forest Plans as amended by the Northwest Forest Plan, Eastside Screens, and pending ICBEMP decision. Management of acquired lands would emphasize the maintenance or improvement of LOS characteristics, including maintaining or improving habitat connectivity, reducing fragmentation, and maintaining snags and down logs during management activities. Lands acquired by CP are expected to be intensively managed for timber production as guided by the Oregon State Forest Practices Act. The Oregon State Forest Practices Act administrative rules do not provide protection of LOS or address the issues of habitat connectivity or fragmentation.
>
> The cumulative effects of the Proposed Action would be reduced distribution and abundance of LOS habitats for some associated wildlife species, and reduced amounts of large, old tree forests for public use and enjoyment for approximately the next 50–100 years, specifically in the Sellers and Toast subwatersheds. Intensive timber management

by CP is expected to reduce the amount and distribution of LOS in these areas. It is expected that LOS stands would be harvested and more closely resemble early or midseral stand conditions. CP managed lands are expected to have fewer large trees, snags, and down logs than if managed by the NFS. Loss in public ownership of habitat in the Sellers and Toast subwatersheds is expected to reduce habitat connectivity and the ability of LOS associated species to move across the landscape. After harvest, LOS associated species are not expected to occupy this portion of the exchange area.

. . . .

There are four Management Indicator Species that contain habitat in the proposed exchange area. The Proposed Action would result in minor gains in habitat under public ownership for the northern goshawk (702 acres) and the northern three-toed woodpecker (1,874 acres). Minor net acres of habitat for the pileated woodpecker (47 acres) and the American martin (218) would be conveyed to Crown Pacific. Changes in acres of habitat for MIS are minor across the exchange and no effect to viability would be expected.

Over the long-term, 100 years or more, NFS management is expected to maintain or improve LOS habitat characteristics and connectivity, and reduce fragmentation. Consolidation of ownership is expected to improve the ability of the NFS to consistently manage larger, contiguous blocks for ecological and social values.

AR 6452 at 36–37.

These conclusions were disclosed and examined in detail in the administrative record. *See*, for example, Report on Wildlife Occurrence and Habitat Suitability for the Crown Pacific Land Exchange, AR 3150–3259; the Draft Environmental Assessment, AR 3970; the Draft Environmental Impact Statement, AR 5508; and the Final Environmental Impact Statement, AR 6452, 6453. The Forest Service recognized that "[t]he intermingled owner-

ship pattern and scattered distribution of LOS stands across the landscape [ ] provide biological diversity, serve as refugia, and facilitate the dispersal of LOS associated species." AR 6452 at 29. The Forest Service concluded, however, that "[t]he current ownership pattern would not allow improvement of habitat connectivity or reductions in habitat fragmentation." AR 6452 at 30.

After careful consideration, the Forest Service found that the "[c]ontinued timber harvest on Crown Pacific lands is expected to make management more difficult for LOS associated species to disperse across the landscape and [to] reduce the effectiveness of these areas of refugia." AR 6451 at 7. This court concludes that the Forest Service took a hard look at the effects of the land exchange on old growth/LOS dependent species and made an informed decision that the immediate negative impacts were acceptable in order to achieve its positive long-term ecosystem objectives.

The appraisals for the land exchange show that the total volume of harvestable timber on the Crown Pacific lands to be exchanged (110 million board feet) is nearly equal to the total volume of harvestable timber on the Forest Service land to be exchanged (117 million board feet). The Forest Service surrenders a larger volume of timber. Crown Pacific surrenders a larger volume of mature ponderosa pine, which is the most valuable timber on the lands exchanged. Crown Pacific conveys to the Forest Service a larger total acreage of land, including more valuable stream frontage and riparian lands. The Forest Service receives land of at least equal value in this proposed land exchange.

The plaintiffs advance the position taken by ODFW that controversial lands should be removed from the proposed land exchange so that the land exchange will result in no net loss of LOS habitat and connectivity function. However, this court concludes that the Forest Service is free to

disagree with the ODFW. The Forest Service is not prohibited by NEPA or FLPMA from making an informed and reasonable decision to exchange LOS timber stands in order to accomplish its long-term ecological management goals. The purpose of the land exchange has always been to eliminate inholding and to create consolidated blocks of land for effective and efficient management. To remove all controversial lands from the exchange will not eliminate inholdings and joint boundaries which are necessary to accomplish the stated purpose of the land exchange. The court concludes that the Forest Service thoroughly examined this issue and acted reasonably in deciding that it was in the public interest to suffer the loss of small, isolated LOS stands of timber as a means to achieve broader ecosystem objectives.

B. *Sensitive Plant Species*

The plaintiffs contend that the defendants violated NEPA by failing to adequately analyze the foreseeable impacts to sensitive plant species as a result of the proposed land exchange. The plaintiffs argue that there is no evidence in the administrative record to support the conclusion of the Forest Service that a transfer of two percent of the global population of Peck's Milkvetch and 3.6 percent of the known global population of Pumice Grapefern will not cause a significant impact. In addition, the plaintiffs contend that a third sensitive plant species, Artemesia ludoviciana, was not discussed in the Draft Environmental Impact Statement and only discussed in the Biological Evaluation attached to the Final Environmental Impact Statement.

The defendants contend that the effects of the proposed land exchange on sensitive plant communities are examined as a key issue in the Final Environmental Impact Statement and the administrative record.

The impacts of the proposed land exchange on sensitive plants are summarized in the Final Environmental Impact Statement. AR 6452 at 45–49. The impacts and an analysis of the methods of determining those impacts are set forth in the "Biological Evaluation for Endangered, Threatened, Proposed, and Sensitive Plants." AR 6453, Appendix D. Surveys of threatened and endangered sensitive plants were conducted by environmental consultants early in the environmental analysis. AR 1281–1304. A preliminary investigation of the presence of sensitive plant species on lands that were potentially to be exchanged was prepared. AR 1484–1513. Environmental consultants conducted an analysis of the effects of the land exchange on sensitive plant species. AR 3668–3711; 6453, Appendix D.

The effects of the proposed land exchange on sensitive plant species was adequately examined in the administrative record and in the NEPA documents made available in the public review process. The court concludes that the Forest Service made an informed decision subject to public input and review to accept the risk of the stated impacts to the three plant species at issue.

C. *Property Rights Public Access, and Recreational Values*

■ The Draft Environmental Impact Statement and the Final Environmental Impact Statement provide an analysis of the impacts of the land exchange on the regional economy, society, and adjacent residential landowners. AR 5508; 6452 at 23, 93, 95, 100–105, 108, 112–119. The Forest Service prepared its own analysis of the effects of the land exchange on scenic values. AR 6239–6250. Adjacent landowners—concerned about the effects of the land exchange—provided a substantial volume of comments during the public comment period. AR 6453, Appendix G. The Forest Service adjusted the land exchange in response to some of these comments. AR 6451 at 8–9. The court concludes that the Forest Service carefully examined the impacts of the land exchange upon the property rights of adjacent landowners, on public access, and on recreational and real estate values and received

and considered extensive public input in its decision to go forward with the Land Exchange Project.

2. *Alternatives in the Final Environmental Impact Statement*

■ The plaintiffs contend that the Final Environmental Impact Statement violates NEPA because it considers only two alternatives: 1) the "Proposed Action Alternative;" and 2) the "No Action Alternative." The plaintiffs contend that the Forest Service narrowed the range of alternatives in the Final Environmental Impact Statement by defining the purpose of and the need for the action too narrowly. The plaintiffs contend that the Forest Service should have considered the alternatives of purchasing the Crown Pacific lands outright or purchasing conservation easements.

The Forest Service contends that the definition of "Purpose of and Need for Action" in the Final Environmental Impact Statement reflects the statutory findings of the United States Congress in enacting legislation for more efficient land exchanges, and that it need not have extended the definition of "Purpose of and Need for Action" beyond the statutorily-expressed objectives of the United States Congress in conducting land exchanges. AR 6452.

The United States Congress found and declared that:

(1) land exchanges are a very important tool for Federal and State land managers and private landowners to consolidate Federal, State, and private holdings of land or interests in land for purposes of more efficient management and to secure important objectives including the protection of fish and wildlife habitat and aesthetic values; the enhancement of recreation opportunities; the consolidation of mineral and timber holdings for more logical and efficient development; the expansion of communities; the promotion of multiple-use values; and fulfillment of public needs;
. . .

Pub.L. No. 100–409, 102 Stat. 1086 (Aug. 20, 1988), § 2(a), amending the Federal Land Policy and Management Act, 43 U.S.C. § 1716.

Regulations for the implementation of NEPA provide that an environmental impact statement should identify a range of alternatives and then analyze those alternatives that are reasonably responsive to the purpose and need for the action. 40 C.F.R. §§ 1502.13, 1502.14(a). An environmental impact statement is also required to identify those alternatives that were eliminated from the detailed study and explain why those alternatives were eliminated from the detailed study. 40 C.F.R. § 1502.14(a).

The Final Environmental Impact Statement states: "Purpose of and Need for Action—The purpose of this proposed land exchange is to consolidate land ownership and enhance long-term resource conservation and management." AR 6452 at 4. This purpose is to be met by "reducing intermingled ownerships," by "reducing the number of inholdings," and by "acquiring key parcels to meet specific resource needs." *Id.*

Initially, the Forest Service considered a total of seven alternatives in addition to the "No Action" alternative. AR 6451 at 14–17; 6452 at 13–16. The Forest Service evaluated each alternative to the land exchange adopted against the purpose and need for the land exchange, and dismissed six of those alternatives concluding that they were not consistent with the purpose and need for the action. The Forest Service provided an explanation for each alternative evaluated and dismissed. The purpose and need for the land exchange, the initial range of alternatives, the alternatives dismissed, and the reasons for the dismissals were the subject of public input through the process of completing the Draft Environmental Impact Statement and the Final Environmental Impact Statement. The statement of purpose and need meets the requirements of 40 C.F.R. § 1502.13. This court gives deference to

the decision of the Forest Service as to the purpose and the need for the proposed land exchange.

Because a land exchange involves the negotiation of an equal value exchange based upon an identified pool of eligible lands, the Forest Service continued to weigh the economic and environmental values of the eligible parcels of land in order to arrive at the land exchange recommended by the Record of Decision. AR 6451. The Forest Service reduced the size of the land exchange after considering the public comments made about the Draft Environmental Impact Statement. AR 6451 at 4. Taking into consideration the purpose and the need for the land exchange, the Forest Service made a reasoned decision to eliminate certain alternatives from consideration and to proceed with the remaining alternatives. The court concludes that the Forest Service did not have an obligation to consider the alternatives of purchasing the Crown Pacific lands outright or of purchasing conservation easements from Crown Pacific. Neither of these alternatives would have met the expressed purpose of the Forest Service to consolidate land ownership because isolated tracts of Forest Service lands and intermingled ownership would remain. In addition, there is no evidence that these were viable alternatives given the large appropriation of government funds that these alternatives would have required. The court finds that the Forest Service appropriately identified and considered the "No Action Alternative" and the "Proposed Action Alternative" in this case. The selection of the alternatives in this case was adequate to foster informed public participation and informed Forest Service decisionmaking.

### 3. *Pending Eastside Environmental Impact Statements*

■ The plaintiffs contend that the Final Environmental Impact Statement violates NEPA because the Forest Service was required to apply the Eastside Screens to this land exchange. The plaintiffs contend that there is no rational basis

for the Forest Service to apply the Eastside Screens, which prohibit net loss of LOS forest stands, to timber sales but not to land exchanges because the result is the same—net loss of LOS forests. In addition, the plaintiffs contend that the Council of Environmental Quality (CEQ) regulations prohibit the land exchange from going forward until the Interior Columbia Basin Ecosystem Management Project, which is currently preparing the Eastside and Upper Columbia River Basin Environmental Impact Statement, has completed its work.

The Forest Service contends that the Eastside Screens apply only to Forest Service timber sales and not to land exchanges. The Forest Service contends that there is no requirement that the environmental impact statement under preparation through the Interior Columbia Basin Ecosystem Management Project is completed prior to this land exchange.

While the plaintiffs understandably argue that the Eastside Screens should be applied to land exchanges because LOS forests are being lost, the Forest Service accurately notes that each Eastside Screen specifically states that the action applies to "timber sales," and a land exchange is not a timber sale. AR 151, 357. The court concludes that there is no basis in law or fact to apply the Eastside Screens to the Land Exchange Project.

40 C.F.R. § 1506.1(c) provides:

While work on a required program environmental impact statement is in progress and the action is not covered by an existing program statement, agencies shall not undertake in the interim any major Federal action covered by the program which may significantly affect the quality of the human environment unless such action:

(1) Is justified independently of the program;

(2) Is itself accompanied by an adequate environmental impact statement; and

(3) Will not prejudice the ultimate decision on the program. Interim action prejudices the ultimate decision on the program when it tends to determine subsequent development or limit alternatives.

In *ONRC Action v. Bureau of Land Management,* 150 F.3d 1132, 1134 (9th Cir. 1998), the plaintiffs sought to enjoin the Bureau of Land Management from conducting "land exchanges affecting LS/OG forests" until the Eastside and Upper Columbia River Basin Environmental Impact Statement was completed. The United States Court of Appeals for the Ninth Circuit rejected the position of the plaintiffs stating:

When an EIS is underway NEPA regulations established by the Council of Environmental Quality ("CEQ") prohibit an agency from taking any actions that would significantly impact the environment. 40 C.F.R. § 1506.1(c) (1997). This limitation, however, is not without qualification....

... BLM argues that the RMPs are the existing program statement that currently cover land management and resource allocation on BLM controlled lands. Thus, this section of the CEQ regulations limiting agency action pending completion of an EIS does not apply here.

....

... Even if parts of the Plan replace some of the existing RMPs, there is no provision in NEPA or regulations promulgated under NEPA requiring that the existing statements not be subject to change. Thus, the exception in 40 C.F.R. § 1506.1(c) applies to the facts in this case.

*Id.* at 1138 (footnotes omitted).

■ The land exchange in the case before this court is being conducted pursuant to the Forest Plans of the three National Forests involved in the proposed exchange. Each of these three National Forests has its "existing program statement." 40 C.F.R. § 1506.1(c). The Record of Decision for the land exchange contains a determination by the Forest Service that the exchange is consistent with the three applicable existing Forest Plans, as amended by the Eastside Screens. AR 6451 at 18. The land exchange itself is accompanied by an adequate environmental impact statement. The NEPA documents relating to the land exchange analyze the effect of the Land Exchange Project on the Interior Columbia Basin Ecosystem Management Project, and the Record of Decision concludes that the land exchange conforms to the goals of the Interior Columbia Basin Ecosystem Management Project. AR 6451 at 6. The exception in 40 C.F.R. § 1506.1(c) applies to the facts in this case. There is no provision of NEPA or any of its regulations which prohibit the Forest Service from going forward with the land exchange pending the completion of the Eastside and Upper Columbia River Basin Environmental Impact Statement for the Interior Columbia Basin Ecosystem Management Project.

## CONCLUSION

The USDA Forest Service/Crown Pacific Limited Partnership Land Exchange Project does not violate NEPA or the FLPMA. The court will enter an order as follows:

1. the motion for summary judgment filed by the defendant-intervenor, Crown Pacific, L.P. (# 112) is granted;

2. the motion for summary judgment filed by the federal defendants (# 115) is granted;

3. the motion for summary judgment filed by the plaintiffs (# 120) is denied;

4. the motion to amend complaint to add Sierra Club as plaintiff filed by the plaintiffs (# 137) is granted;

5. the motion for permanent injunction filed by the plaintiffs (# 147) is denied; however, the court will order the Forest Service not to exchange deeds for this land

exchange for seven days after the date that the judgment is entered in order to allow the plaintiffs to file a motion for stay pending appeal; and

6. the motion for order waiving bond filed by the plaintiffs (# 150) is denied.

The court will enter judgment in favor of the federal defendants and defendant-intervenor Crown Pacific, L.P. and against the plaintiffs.

**MAP 1**

**CURRENT LAND OWNERSHIP BEFORE THE LAND EXCHANGE**

**Legend**
- Forest Service Lands
- Crown Pacific Lands
- Other Ownership
- Lakes
- Major Roads
- Jointly Administered Property Boundary

Location Map

Deschutes National Forest
Fremont National Forest
Winema National Forest

Record of Decision, AR 6451

**MAP 2**

**PROPOSED LAND OWNERSHIP AFTER THE LAND EXCHANGE WITH OUR MODIFICATIONS**

Legend

- Dropped Parcels -retained by Forest Service
- Dropped Parcels -retained by Crown Pacific
- Potential Balancing Parcel
- Forest Service Lands
- Crown Pacific Lands
- Other Ownership
- Lakes
- Major Roads
- Jointly Administered Property Boundary

Location Map

FOREST SERVICE U S DEPARTMENT OF AGRICULTURE

Deschutes National Forest
Fremont National Forest
Winema National Forest

Record of Decision. AR 6451