# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

NATIVE ECOSYSTEMS COUNCIL,
             *Plaintiff-Appellant,*

v.

UNITED STATES FOREST SERVICE, an
agency of the U.S. Department of
Agriculture; DWIGHT CHAMBERS,
acting supervisor, Helena National
Forest; KATHLEEN MCALLISTER,
Acting Regional Forester for
Region One U.S. Forest Service;
DALE BOSWORTH, Chief of United
States Forest Service,
             *Defendants-Appellees.*

No. 04-35274

D.C. No.
CV-01-00188-DWM

OPINION

Appeal from the United States District Court
for the District of Montana
Donald W. Molloy, District Judge, Presiding

Argued and Submitted
February 14, 2005—Seattle, Washington

Filed November 7, 2005

Before: Betty B. Fletcher, M. Margaret McKeown, and
Ronald M. Gould, Circuit Judges.

Opinion by Judge McKeown

15133

**COUNSEL**

Thomas J. Woodbury, Forest Defense, P.C., Missoula, Montana, for the plaintiff-appellant.

Elizabeth Ann Peterson, Attorney, Environmental & Natural Resources Division, United States Department of Justice, Washington, D.C., for the defendants-appellees.

**OPINION**

McKEOWN, Circuit Judge:

Native Ecosystems Council ("Native Ecosystems") appeals the district court's grant of summary judgment to the United States Forest Service ("Forest Service") in connection with the Forest Service's approval of the Jimtown Vegetation Project ("Jimtown Project") in the Helena National Forest. To lower the potential for a catastrophic fire, the Jimtown Project involves thinning, prescribed burning, and weed management on approximately 1,500 acres in an area of the Helena National Forest prone to high intensity fires.

Native Ecosystems claims the Forest Service violated the

National Environmental Policy Act ("NEPA"),[1] 42 U.S.C.
§ 4321 *et seq.*, by preparing an Environmental Assessment
("EA") instead of an Environmental Impact Statement
("EIS") and by considering only two alternatives—the pro-
posed Jimtown Project and a "no action" alternative. In addi-
tion, Native Ecosystems claims the Forest Service violated the
National Forest Management Act ("NFMA"), 16 U.S.C.
§ 1600 *et seq.*, because the project threatens the forest-wide
viability of the northern goshawk.[2] We affirm.

## BACKGROUND

The Helena National Forest encompasses nearly one mil-
lion acres in western Montana. The Forest Service manages
the Helena National Forest according to the 1986 Helena For-
est Plan. *See* 16 U.S.C. § 1604(a). Parts of the Helena

---

[1]Environmental law cases inevitably involve an alphabet soup of acro-
nyms. To the extent possible, we have minimized the use of acronyms. As
an aid to the reader, we provide a key to the few acronyms used in this
opinion: 1) NEPA (National Environmental Policy Act); 2) EA (Environ-
mental Assessment); 3) EIS (Environmental Impact Statement); 4) NFMA
(National Forest Management Act); 5) DN/FONSI (Decision Notice/
Finding of No Significant Impact); 6) SIR (Supplemental Information
Report); and 7) APA (Administrative Procedure Act).

[2]During oral argument, counsel for Native Ecosystems withdrew its
motion to supplement the record with the Helena National Forest's June
1994 Five Year Review. As a result, we disregard all of Native Eco-
systems's arguments in its amended briefs pertaining to the June 1994
Five Year Review. We deem Native Ecosystems's motion to supplement
the record to be moot.

Native Ecosystems included another document that was not part of the
administrative record in its original Excerpts of Record ("Goshawks in the
North Big Belt Landscape Through 2003"). The Forest Service's brief
urged us to ignore this goshawk monitoring log. Native Ecosystems
removed the 2003 log from its amended Excerpts of Record and moved
the log to Appendix 1 of its amended opening brief. During oral argument,
counsel for the Forest Service informed the court that it may use the 2003
log as demonstrative evidence of information in the administrative record.
We will ignore the Forest Service's request that the panel disregard the
2003 log.

National Forest consist of dry ponderosa pine stands, and are characterized by the Forest Service as "fire dependent ecosystems." Over the past ninety years, however, the Forest Service suppressed fires in this ecosystem, leading to what it describes as "dense stocking and intense competition for moisture and nutrients on these sites." In the Forest Service's view, prevention of low-intensity, periodic fires has led to an increase in the likelihood of large, stand-replacing fires. Because forests are more dense, fires spread from small understory trees to the crowns of the older overstory trees, rather than burning at a low-intensity on the floor and understory of the forest.

Due to nearly a century of fire suppression, the Forest Service has witnessed an increase in stand-replacing wildfires in the Northwest. In December 2000, the Forest Service published an EA for the Jimtown Project, a resource management project in the Helena National Forest designed to reduce the potential for a large-scale, high intensity, stand-replacing fire in the Jimtown vicinity. According to the Forest Service, a fire in the vicinity of the Jimtown Project—the July 2000 Cave Gulch fire which burned more than 27,000 acres of the Helena National Forest —evidences the area's potential for "intense and extensive stand replacing fires."[3] The Jimtown Project, as originally proposed, consisted of forest thinning through timber harvest, low-intensity underburning, and weed management, all of which are intended to provide for a more sustainable forest.

The proposed Jimtown Project lies just 150 yards north of a nest area used by a pair of northern goshawks in the summers of 2000 and 2002. The Forest Service has designated goshawks as a sensitive species,[4] a designation that requires

---

[3]According to the Forest Service, stand-replacing fire consumed more than sixty percent of the forested habitat within the perimeter of the 30,000 acres affected by the Cave Gulch fire.

[4]Although the Forest Service considers the northern goshawk to be a sensitive species, the Ninth Circuit recently determined that the Fish and

the Forest Service to prepare a Biological Evaluation to consider the potential impact of proposed forest management actions on the goshawks.

The Forest Service completed a Biological Evaluation for the Jimtown Project, and concluded that the project "[m]ay impact individuals or habitat but [is] unlikely to contribute to a trend towards Federal listing or cause a loss of viability to the population or species." In particular, the proposed Jimtown Project would "open up" 720 acres of forest habitat, making it less attractive to goshawks for foraging. The Biological Evaluation also concluded that the primary threat to goshawks is loss of habitat due to logging and fire. The Biological Evaluation noted that an "[e]levated risk of stand-replacement fire would remain" if the Forest Service decided to forego the Jimtown Project, putting existing goshawk habitat in the area at risk. The Jimtown Project EA incorporated the Biological Evaluation's goshawk findings.

The Helena National Forest Plan also designated goshawks as a management indicator species for old-growth forest in the Helena National Forest. Forest Service planning regulations direct the Forest Service to select management indicator species for the purpose of monitoring the effects of management activities in various types of habitat. 36 C.F.R. § 219.19(a)(1), (6) (2000).[5] The Forest Plan requires the maintenance of five

---

Wildlife Service's decision not to list the goshawk as either threatened or endangered was supported by ample evidence, which included a determination that the goshawk population was not declining in the western states. *Ctr. for Biological Diversity v. Badgley*, 335 F.3d 1097, 1100-01 (9th Cir. 2003).

[5]New regulations amending the forest planning rule were adopted on November 9, 2000. *See* National Forest System Land and Resource Management Planning, 65 Fed. Reg. 67,514 (Nov. 9, 2000). However, application of these regulations was delayed. *See* National Forest System Land and Resource Management Planning; Extension of Compliance Deadline for Site-Specific Projects, 68 Fed. Reg. 53,294 (Sept. 10, 2003). As a result, the regulations relevant to the Jimtown Project are found in the July 1, 2000 Code of Federal Regulations. 36 C.F.R. 219.19 (2000).

percent of the Helena National Forest as old growth. The Jim-town Project does not include any old growth, but the EA emphasized that the Forest Service will retain larger trees and trees "with old growth character," and suggested that the Jim-town Project would contribute to the development of a sustainable old-growth forest in the project area.

After considering comments filed in response to the Jim-town Project EA, including comments filed by Native Eco-systems, the Forest Service issued a Decision Notice and Finding of No Significant Impact ("DN/FONSI") in May 2001. In the DN/FONSI, the Forest Service partially rested its decision not to prepare an EIS on the fact that the Forest Service prepared an EIS in 1996 for a substantially similar and larger management project in the Helena National Forest—the Bull-Sweats Project. The Bull-Sweats Project was located about four miles north of the Jimtown Project and applied the same treatment techniques to an area more than two-times the size of the Jimtown Project area. The Forest Service noted in the DN/FONSI that environmental monitoring associated with the Bull-Sweats Project demonstrated that the type of treatments proposed in the Jimtown Project "do not have significant effects."[6] In particular, the Forest Service concluded based on wildlife monitoring that goshawks continued to nest in the vicinity of the Bull-Sweats Project after the project treatments.

The DN/FONSI also included an amendment to the Helena National Forest Plan. The project area, whether the Forest Service implements the Jimtown Project or opts for the no-action alternative, is out of compliance with the Helena National Forest Plan's hiding cover/road density standard designed to protect big game.[7] The proposed amendment

---

[6]The EA stated that the Bull-Sweats project was "very similar in many respects to the Jimtown proposed action," and that the "habitats in the Bull-Sweats area are nearly identical to those in the Jimtown Project area."

[7]The DN/FONSI described the purpose of the hiding cover/road density standard:

reduces the hiding cover/road density standard applicable to the project area by three percent, thus curing non-compliance.

Native Ecosystems filed an administrative appeal challenging the DN/FONSI, which the Forest Service denied. In October 2001, Native Ecosystems filed suit in federal court in Montana. In July 2003, while the case was pending in district court, a wildfire burned portions of the Jimtown Project area. One-thousand acres burned in the Jimtown fire, and approximately eighty percent of the trees died or were expected to die within the year following the fire. The fire burned about 370 acres of the 830 acres proposed for thinning and underburning in the proposed Jimtown Project. The Forest Service published a Supplemental Information Report ("SIR") that concluded that the Jimtown Fire, and the subsequent reduction of the thinning and underburning portion of the project to 460 acres, did not change its conclusion that the Jimtown Project would not have a significant effect on the environment.

The district court granted the Forest Service's motion for summary judgment. With respect to the claims pending on appeal, the district court rejected Native Ecosystems's claim that the Forest Service violated NEPA by failing to consider reasonable alternatives to the Jimtown Project in addition to the EA's "no action" alternative and the proposed project alternative.[8] The district court also determined that the Forest Ser-

---

The Forest Plan contains an objective for maintaining big game habitat capability and hunter opportunity so as to provide for a first week [of the big game rifle season] bull elk harvest that does not exceed 40 percent of the total bull harvested [of the five week general season]. To help meet this objective, the Plan adopted a standard that calculates habitat capability [security] on an index that combines open road density and hiding cover.

DN/FONSI, Attachment 1 at 21 (alteration in original).

[8]The district court noted that the Forest Service actually proposed six alternatives in the EA—the no-action and proposed project alternatives,

vice did not act arbitrarily and capriciously in concluding that the Jimtown Project would not impact goshawk viability under NFMA and in concluding that an EIS was not necessary to consider the impacts of the project on the goshawk population.

## ANALYSIS

### I. STANDARD OF REVIEW

We review the district court's grant of summary judgment de novo. *Neighbors of Cuddy Mountain v. U.S. Forest Serv.* ("Neighbors of Cuddy Mountain I"), 137 F.3d 1372, 1376 (9th Cir. 1998). Because NFMA and NEPA do not provide a private cause of action to enforce their provisions, agency decisions allegedly violating NFMA and NEPA are reviewed under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq.*; *Neighbors of Cuddy Mountain v. Alexander* ("Neighbors of Cuddy Mountain II"), 303 F.3d 1059, 1065, 1067 (9th Cir. 2002) . Under the APA, we may set aside an agency decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1149 (9th Cir. 1998).

### II. NEPA CLAIMS

NEPA requires agencies to prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). NEPA's implementing regulations provide that an agency shall prepare

---

and four other alternatives that were dismissed from detailed consideration: "Although the two alternatives that the [Helena National Forest] considered amount to minimal compliance with NEPA, the [Helena National Forest] remained in compliance with NEPA nonetheless. The [Helena National Forest] considered six reasonable alternatives, including a no-action and preferred alternative. . . . This is all NEPA requires."

an EA to determine whether a proposed federal action will have a significant impact and to determine whether preparation of an EIS will be necessary. 40 C.F.R. § 1508.9 (2000); *see also Bob Marshall Alliance v. Hodel*, 852 F.2d 1223, 1225 (9th Cir. 1988). An EA is a "concise public document" that "include[s] brief discussions of the need for the proposal, of alternatives as required by [42 U.S.C. § 4332(2)(E)], of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. §§ 1508.9 (a), (b) (2000). If the agency concludes in the EA that there is no significant effect from the proposed project, the federal agency may issue a finding of no significant impact ("FONSI") in lieu of preparing an EIS. 40 C.F.R. § 1508.9(a)(1) (2000); *id.* § 1508.13 (" 'Finding of no significant impact' means a document by a Federal agency briefly presenting the reasons why an action . . . will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared.").

NEPA requires us to analyze whether the Forest Service took a "hard look" at the likely effects of the proposed Jimtown Project. *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1216 (9th Cir. 1998). In other words, the Forest Service must "undertake a thorough environmental analysis before concluding that no significant environmental impact exists." *Id.* Determining whether the Forest Service took the requisite "hard look" is judged against the APA's arbitrary and capricious standard. *Id.*

## A. PREPARATION OF AN ENVIRONMENTAL ASSESSMENT RATHER THAN AN ENVIRONMENTAL IMPACT STATEMENT

[1] Native Ecosystems seeks to compel the Forest Service to prepare an EIS, rather than simply an EA, for the Jimtown Project. An agency is required to prepare an EIS where there are substantial questions about whether a project *may* cause

significant degradation of the human environment. *See Idaho Sporting Congress*, 137 F.3d at 1149. As we have explained:

> In reviewing an agency's decision not to prepare an EIS under NEPA, we employ an arbitrary and capricious standard that requires us to determine whether the agency has taken a "hard look" at the consequences of its actions, "based [its decision] on a consideration of the relevant factors," and provided a "convincing statement of reasons to explain why a project's impacts are insignificant."

*Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 730 (9th Cir. 2001) (citations omitted) (quoting *Metcalf v. Daley*, 214 F.3d 1135, 1141 (9th Cir. 2000) (alteration in original)).

[2] In benchmarking whether the Jimtown Project may have a significant effect on the environment, we turn to the NEPA regulations that define "significantly." 40 C.F.R. § 1508.27 (2000). Whether a project is significant depends on both the project's context and its intensity. *Id.* A project's intensity will be evaluated based on various factors, three of which are relevant to Native Ecosystems's appeal: 1) "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial," *id.* § 1508.27(b)(4); 2) "[t]he degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks," *id.* § 1508.27(b)(5); and 3) "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts," *id.* § 1508.27(b)(7).

### 1. FOREST SERVICE'S PROJECT-SPECIFIC CONCLUSION OF NO SIGNIFICANT IMPACT

Native Ecosystems seeks to capitalize on the Forest Service's thorough and candid environmental analysis by seizing

on various bits of information and data in the Jimtown Project NEPA documents (the EA, DN/FONSI, SIR and Biological Evaluation) to claim that substantial questions exist as to whether the Jimtown Project may have a significant effect on the environment. The Biological Evaluation and DN/FONSI acknowledged that the Jimtown Project may impact individual goshawks and their habitat, but determined that this impact was not significant.

The presence of negative effects regarding the impact of the Jimtown Project on goshawks or even information favorable to Native Ecosystems's position in the project's NEPA documents, however, does not mean Native Ecosystems has demonstrated that the Jimtown Project's impacts are "highly controversial" or "highly uncertain." A project is "highly controversial" if there is a " 'substantial dispute [about] the size, nature, or effect of the major Federal action rather than the existence of opposition to a use.' " *Blue Mountains*, 161 F.3d at 1212 (quoting *Sierra Club v. U.S. Forest Serv.*, 843 F.2d 1190, 1193 (9th Cir. 1988)). Further, in explaining the "highly uncertain" standard, we stated:

> An agency must generally prepare an EIS if the environmental effects of a proposed agency action are highly uncertain. Preparation of an EIS is mandated where uncertainty may be resolved by further collection of data, or where the collection of such data may prevent "speculation on potential . . . effects. The purpose of an EIS is to obviate the need for speculation by insuring that available data are gathered and analyzed prior to the implementation of the proposed action."

*National Parks*, 241 F.3d at 731-32 (alteration in original) (citations omitted) (quoting *Sierra Club*, 843 F.2d at 1195).

[3] The use of the word "highly" in the NEPA regulations to modify "controversial" and "uncertain" means that infor-

mation merely favorable to Native Ecosystems's position in the NEPA documents does not necessarily raise a substantial question about the significance of the project's environmental effects. Rather, as our explanation of the NEPA regulations makes clear, something more must exist for this court to label a project highly controversial or highly uncertain. Simply because a challenger can cherry pick information and data out of the administrative record to support its position does not mean that a project is highly controversial or highly uncertain.

**[4]** Under Native Ecosystems's theory, any information included in an EA and its supporting NEPA documents that admits impacts on wildlife species and their habitat would trigger the preparation of an EIS. Not only would such a standard deter candid disclosure of negative information, it does not follow that the presence of some negative effects necessarily rises to the level of demonstrating a significant effect on the environment. We decline to interpret NEPA as requiring the preparation of an EIS any time that a federal agency discloses adverse impacts on wildlife species or their habitat or acknowledges information favorable to a party that would prefer a different outcome. NEPA permits a federal agency to disclose such impacts without automatically triggering the "substantial questions" threshold. In short, NEPA requires us to determine whether the Forest Service took a "hard look" at the environmental consequences of a proposed action.

A "hard look" should, of course, involve the discussion of adverse impacts. A "hard look" does not dictate a soft touch or brush-off of negative effects. But such information does not automatically make the project "highly controversial" or "highly uncertain" for the purposes of determining whether substantial questions exist as to the significance of the effect. We turn then to Native Ecosystems's various claims that substantial questions exist as to whether the Jimtown Project may have a significant effect on the environment.

### a.  GOSHAWK HABITAT COMPONENTS

Native Ecosystems asserts that as to the goshawks, the project is highly controversial and highly uncertain because the Forest Service failed to abide by a 1992 Forest Service report, "Management Recommendations for the Northern Goshawk in the Southwestern United States" ("Reynolds Report"). According to Native Ecosystems, the EA failed to address the Reynolds Report goshawk habitat recommendations pertaining to old growth, post-fledgling family areas, and canopy cover. This argument fails because the Forest Service referenced the Reynolds Report multiple times in the various Jimtown NEPA documents and specifically addressed each of these habitat recommendations.

[5] Although the Reynolds Report recommends maintaining a certain percentage of old growth in a goshawk's home range, it is significant that no old growth exists in the project area. As a result, the Jimtown Project is not capable of negatively impacting the old growth component of the Jimtown goshawk home range. It can hardly be said that a controversy or uncertainty exists under these circumstances. More pointedly, Native Ecosystems's concern that the Forest Service fails to demonstrate in the EA that it has set aside sufficient old growth habitat for goshawks ignores the very purpose of the Jimtown Project—creation of a landscape that permits large trees to mature into old growth. The DN/FONSI explained that "[o]ne of the goals of the project is to create a stand structure that will allow old-growth to develop on the site over the long term and remain intact in the face of fire," an objective that precisely meets Native Ecosystems's concern.

[6] Both the Biological Evaluation and DN/FONSI cite the Reynolds Report habitat designations, including the nesting, post-fledgling, and foraging area acreage recommendations, and discuss their impact at length before concluding that the Jimtown Project will not deprive the nearby goshawk home

ranges of these necessary components. Native Ecosystems complains that the Forest Service failed to specifically delineate a post-fledgling family area to be preserved around the 2000 and 2002 goshawk nest stand 150 yards from the Jimtown Project area. The Biological Evaluation and DN/FONSI establish that the Forest Service took a hard look at the available post-fledgling family area habitat in the vicinity of the Jimtown Project. Indeed, the Forest Service's point-by-point response to Native Ecosystems's post-SIR comments underscores our conclusion that the Forest Service took a hard look and fairly considered the Reynolds Report habitat recommendations:

> [T]he area proposed for thinning is not good [post-fledgling family area] habitat . . . .

> The key unburned habitat needed to sustain breeding and provide core [post-fledgling family areas] for young goshawks is in the dense, multi-layered mature forest in the nest stand itself and in other such stands spread across north and north east slopes south and west of the project area. These stands are outside the proposed thinning area. As a result, the best habitat contributing to local [post-fledgling family areas] will be retained, and goshawks will be able to continue fledging young in the 2000/2002 nest stand.

**[7]** Finally, Native Ecosystems urges that the Forest Service's failure to disclose the canopy closure in the area before and after the project makes the impact of the project on goshawk habitat "highly uncertain." Although the NEPA documents did not specify percentages of canopy cover in the same manner as delineated in the Reynolds Report, the Forest Service did not ignore the impact of changes to canopy closure in the project area. Nothing in the law or the science mandates wholesale adoption of the details of the Reynolds Report. Ultimately, while the Forest Service concluded that

the project would reduce suitable habitat by about 720 acres, due in part to reduced canopy cover as a result of the thinning component of the project, the project would leave intact sufficient acreage to provide for resident goshawks—about 6,780 acres of mostly forested habitat.

[8] The Forest Service's goshawk habitat analysis and consideration of the Reynolds Report demonstrate the project is neither highly controversial nor highly uncertain. Native Ecosystems's effort to identify conflicts between the Jimtown Project and the Reynolds Report does not raise substantial questions that would trigger the need for an EIS. In fact, as the Reynolds Report explained, current forest conditions put the existing goshawk habitat in jeopardy and thus the proposed thinning and burning would actually be necessary to sustain goshawks and their prey. The push-pull situation of the goshawk is a reality not a fiction. While the Reynolds Report outlines ideal goshawk habitat conditions, including optimum old-growth, post-fledgling, and canopy cover prescriptions, the Report also recognizes that stand-replacing fires wipe out these critical habitat components in their entirety. The proposed Jimtown Project seeks to balance the sometimes conflicting goshawk habitat needs as outlined in the Reynolds Report, and thereby makes a reasoned and reasonable choice between the competing goals of preserving the goshawk's current habitat and promoting a sustainable, long-term habitat for the goshawk.

### b. IMPACT ON GOSHAWK PREY

Native Ecosystems also contends substantial questions are raised by the uncertain effects of the Jimtown Project on red squirrels, which serve as prey for the goshawk. In support of this challenge, Native Ecosystems seizes on the conclusion in the EA that certain species, including the red squirrel, would decline in the project area as a result of the changed habitat.

Native Ecosystems reads the EA as saying that red squirrel populations would suffer a "sharp decline" as a result of the project. The EA's statement is much less dramatic in context:

> The abundance of several species would decline as a result of proposed changes in habitat structure, but it is unlikely that any species would disappear. *Species that would suffer the sharpest population declines* are those tied to the denser stands of mature trees and to the thickets of seedling and sapling conifers. These animals would shift primarily to unthinned reserves in and adjacent to the project area. Species likely to decline are the ruby-crowned kinglet, yellow-rumped warbler, white-breasted nuthatch, red squirrel, porcupine, and brown creeper.

**[9]** The identification of potential declines does not permit us to leap to the conclusion that the EA raises substantial questions on project impact, especially where the EA also concluded that the thinned stand would continue to provide prey for goshawks:

> Overstory thinning would reduce the density of red squirrels—a primary prey item—and make the project area less inviting to foraging goshawks. The thinned stand would continue to support a variety of suitable prey species (hairy woodpeckers, mourning doves, robins, Townsend's solitaires) and local goshawks might continue to exploit it.

Where other prey species will be available, Native Ecosystems's focus on the red squirrel does not demonstrate that the project's effects are highly uncertain.

### c. RELIANCE ON THE BULL-SWEATS EIS

Native Ecosystems challenges the Forest Service's reliance on the Bull-Sweats Project EIS as a demonstration that the

Jimtown Project will not have a significant effect on the environment. The 1996 Bull-Sweats Project was simply a larger version of the same type of fuels reduction project proposed for the Jimtown area. The Forest Service prepared an EIS for Bull-Sweats, which was incorporated by reference into the Jimtown documentation. In concluding that an EIS was not necessary for the Jimtown Project, the Forest Service observed that the proposed management practices were not unique and that monitoring of other projects, particularly the nearby Bull-Sweats Project, documented that such projects did not have significant effects.

Native Ecosystems points to a Forest Service monitoring log to conclude, based on a lack of goshawk sightings in the Bull-Sweats Project area after 1998, that the project somehow eliminated goshawks resident in the project area prior to the Bull-Sweats thinning. The Forest Service offers a very different interpretation of the log, noting that field monitoring showed that goshawks in the Bull-Sweats area change nest sites each year regardless of logging activity and that goshawks are not averse to occupying nest sites close to logged areas. Further, according to the Forest Service, the monitoring data "demonstrates that thinning can be done in a way that will not eliminate local goshawk territories, but that large stand replacement fires will eliminate them." (citations to administrative record omitted). We defer to the Forest Service's explanation of the log.

Native Ecosystems tries to create a facade of high controversy by citing to comments submitted by Dr. Sara Jane Johnson, a wildlife biologist and representative of Native Ecosystems. Dr. Johnson concluded the monitoring log demonstrated that the Bull-Sweats Project eliminated a pair of goshawks. "When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989). The

Forest Service's conclusion that the Bull-Sweats Project did not have a significant effect on goshawks and their habitat (and its reliance on this conclusion in the Jimtown EA and DN/FONSI) was not arbitrary and capricious.

In summary, the Forest Service's consideration and application of the Reynolds Report goshawk habitat recommendations in its NEPA documentation defeats Native Ecosystems's attempt to characterize the Jimtown Project's impacts as highly uncertain or controversial. Dr. Johnson's interpretation of the Reynolds Report and goshawk monitoring data simply does not rise to the high level of controversy that was present in other Ninth Circuit cases where we faulted the agency review. *See Sierra Club*, 843 F.2d at 1193-94 (noting testimony from numerous experts that demonstrate the inadequacies of an EA); *Blue Mountains*, 161 F.3d at 1213 (explaining that a Forest Service EA failed to consider a report on post-fire logging despite the specific directions of the regional forest supervisor to do so); *National Parks*, 241 F.3d at 736 (noting that eight-five percent of 450 comments received during administrative review opposed the EA's preferred alternative). Nor will we "take sides in a battle of the experts," *id.* at 736 n.14, as the Forest Service considered and applied the Reynolds Report and provided a thorough and reasoned explanation for its rejection of Dr. Johnson's position.

## 2. CUMULATIVE EFFECTS ANALYSIS

[10] Although we conclude that the project-specific challenges to the Jimtown Project EA withstand scrutiny, our analysis does not end there. In determining whether an action is significant for the purposes of preparing an EIS, an agency must consider "whether the action is related to other actions with individually insignificant but cumulatively significant impacts." 40 C.F.R. § 1508.27(b)(7) (2000).[9] The regulations further provide:

---

[9]"Cumulative impact" is defined as "the impact on the environment which results from the incremental impact of the action when added to

> Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

*Id.* In accord with the regulatory directives, the Forest Service offered extensive analysis of the cumulative impacts of the Jimtown Project. A review of the DN/FONSI reveals an articulate and careful cumulative effects analysis that took into consideration the impacts of the Cave Gulch fire, the 1986 North Hills fire, two minor thinning projects, and the Bull-Sweats Project. The DN/FONSI recognized that within the cumulative effects area—defined as 29,900 acres—three goshawk home ranges exist, and within each home range, the Forest Service identified the necessary components of goshawk habitat. The DN/FONSI then detailed, from a quantitative perspective, the impact of the project on nest sites and acreage suitable as goshawk habitat. The Forest Service concluded the Jimtown Project's impact on the immediate goshawk home range will not cause it to fall below the Reynolds Report acreage recommendations for nesting, post-fledgling family, and foraging areas, let alone result in a cumulatively significant effect when considered in light of other recent projects and fires in this area of the Helena National Forest. Because significant evidence in the record supports the Forest Service's conclusion that the goshawk's home range will remain viable under the Jimtown Project, we conclude that the Forest Service easily satisfies the standard we articulated in *Neighbors of Cuddy Mountain I*: "To 'consider' cumulative effects, some quantified or detailed information is required.

---

other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7 (2000).

Without such information, neither the courts nor the public, in reviewing the Forest Service's decisions, can be assured that the Forest Service provided the hard look that it is required to provide." 137 F.3d at 1379.[10]

## B.   CONSIDERATION OF RANGE OF ALTERNATIVES

[11] NEPA requires federal agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E). The alternatives provision of NEPA applies whether an agency is preparing an EIS or an EA, and NEPA's implementing regulations require an EA to include "brief discussions of the need for the proposal, of alternatives as required by [42 U.S.C. § 4332(2)(E)], of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. § 1508.9(b) (2000); *see also Bob Marshall Alliance*, 852 F.2d at 1229 ("[A]ny proposed federal action involving unresolved conflicts as to the proper use of resources triggers NEPA's consideration of alternatives requirement, whether or not an EIS is also required."). In short, NEPA "requires that alternatives . . . be given full and meaningful consideration." *Bob Marshall Alliance*, 852 F.2d at 1229.

Native Ecosystems discredits the Jimtown EA as insufficient because it did not consider a reasonable range of alternatives to the proposed project. Native Ecosystems's argument is confusing. In one breath, Native Ecosystems faults the For-

---

[10]Unlike *Neighbors of Cuddy Mountain I*, where the "Forest Service . . . failed to even mention the number or percentage of trees meeting the definition of old growth that would be destroyed," 137 F.3d at 1379, here the Forest Service identified the number of goshawk home ranges impacted by prior fires and actions in the Jimtown Project cumulative effects area and specifically considered the impact the Jimtown Project and other actions had on goshawk home ranges and the critical components of each home range.

est Service for failing to consider a "range" of alternatives—suggesting that its concern is with the number of alternatives considered by the Forest Service. In the next breath, Native Ecosystems faults the Forest Service for failing to consider an alternative to the Jimtown Project that would "comply" with the Helena National Forest's Forest Plan—suggesting that its concern is with the substance of the alternatives considered by the Forest Service.

If Native Ecosystems is simply concerned with the number of alternatives considered by the Forest Service in the Jimtown Project EA, Native Ecosystems's claim fails. The Forest Service's Jimtown Project EA considered a total of six alternatives, four of which were raised but rejected without detailed consideration. Of the six proposed alternatives, two alternatives—a "no action" alternative and the "preferred alternative" (the proposed Jimtown Project)—were the focus of the EA and given detailed consideration by the Forest Service. Native Ecosystems ignores the four alternatives dismissed by the agency, and contends that the EA's development of only two alternatives failed to meet NEPA's requirements.

NEPA and its implementing regulations only require the following with respect to the number of alternatives that must be considered by an agency: 1) the agency must consider "appropriate" alternatives to recommended courses of action, 42 U.S.C. § 4332(2)(E); 2) an EIS must "[r]igorously explore and objectively evaluate all *reasonable* alternatives" and must explain why it has eliminated an alternative from detailed study, 40 C.F.R. § 1502.14(a) (2000) (emphasis added); 3) the agency must consider a "no action" alternative, *id.* § 1502.14(d); and 4) the agency must designate a "preferred" alternative, *id.* § 1502.14(e). The statutory and regulatory requirements that an agency must consider "appropriate" and "reasonable" alternatives does not dictate the minimum number of alternatives that an agency must consider.

**[12]** To the extent that Native Ecosystems is complaining that having only two final alternatives—no action and a preferred alternative—violates the regulatory scheme, a plain reading of the regulations dooms that argument. So long as "all reasonable alternatives" have been considered and an appropriate explanation is provided as to why an alternative was eliminated, the regulatory requirement is satisfied. In short, the regulation does not impose a numerical floor on alternatives to be considered.[11]

Nor have we previously imposed a numerical requirement as the bellwether of reasonableness. Rather, the substance of the alternatives has been a focus, not the sheer number of alternatives considered. *See Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 813-14 (9th Cir. 1999) (noting that the Forest Service failed to consider an adequate range of alternatives because its EIS included a "no action" alternative and two nearly identical action alternatives, none of which were "more consistent with [the agency's] basic policy objectives than the alternatives that were the subject of final consideration."); *see also W. Land Exch. Project v. Dombeck*, 47 F. Supp. 2d 1196, 1211-12 (D. Or. 1999) (concluding that the Forest Service met its statutory obligations where it had considered and dismissed six alternative plans that did not meet the purpose and needs of the proposed project).

**[13]** We turn now to the substance of the alternatives considered by the Forest Service, and the potential alternatives

---

[11]*Curry v. U.S. Forest Serv.*, 988 F. Supp. 541 (W.D. Pa. 1997), is not to the contrary. The court in *Curry* was not focused solely on the fact that the Forest Service offered only two alternatives in its EA; rather, the court first resolved that the project warranted an EIS instead of an EA because of a potential significant impact on the environment. The court went on to voice its concern that the Forest Service failed to consider a "broad range of reasonable alternatives" as required by NEPA. *Id.* at 551-54. *Curry* simply does not support Native Ecosystems's argument that an EA violates NEPA simply because it has only a "no action" alternative and a "preferred" alternative.

raised by Native Ecosystems, to determine whether the Forest Service considered "appropriate" and "reasonable" alternatives under NEPA. In undertaking this analysis, we join our sister circuits in holding that an agency's obligation to consider alternatives under an EA is a lesser one than under an EIS. In rejecting any alternatives, the agency must only include "brief discussions of the need for the proposal, of alternatives required by [42 U.S.C. § 4332(2)(E)], of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. § 1508.9(b) (2000). *See Mt. Lookout—Mt. Nebo Prop. Prot. Ass'n v. Fed. Energy Regulatory Comm'n*, 143 F.3d 165, 172 (4th Cir. 1998) ("The rigor with which an agency must consider alternatives is greater when the agency determines that an EIS is required for a particular federal action."); *Sierra Club v. Espy*, 38 F.3d 792, 803 (5th Cir. 1994) (same); *Friends of the Ompompanoosuc v. Fed. Energy Regulatory Comm'n*, 968 F.2d 1549, 1558 (2d Cir. 1992) (same).

In judging whether the Forest Service considered appropriate and reasonable alternatives, we focus first on the stated purpose for the Jimtown Project. *See Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1520 (9th Cir. 1992) (benchmarking whether an alternative is reasonable, and should have been considered by the Forest Service in its EA or EIS, depends on the " 'nature and scope of the proposed action' " (quoting *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982))). The "Purpose and Need" section of the EA states:

> The purpose is to maintain healthy, sustainable ecosystems that 1) reduce fire risk, 2) control noxious weeds and provide native habitats similar to the habitat that existed when fire was a natural component of the ecosystem, and 3) provide wood for people's use.

Alternatives that do not advance the purpose of the Jimtown Project will not be considered reasonable or appropriate. *See*

*Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 868 (9th Cir. 2004) ("The 'range of alternatives that must be considered in the EIS need not extend beyond those reasonably related to the purposes of the project.' " (quoting *Laguna Greenbelt, Inc. v. U.S. Dep't of Transp.*, 42 F.3d 517, 524 (9th Cir. 1994))).

According to Native Ecosystems, the Forest Service did not consider a "reasonable" range of alternatives because it failed to consider an alternative that would fully comply with the current Helena National Forest Plan. Native Ecosystems first claims the Forest Service should have considered an alternative that did not involve commercial harvest as part of the thinning portion of the Jimtown Project.[12] Native Ecosystems goes on to argue the Forest Service should have considered in detail an alternative that did not require amendment of the Helena National Forest Plan's hiding cover/road density standard, but instead, included treatment measures designed to move the project area into compliance with the Forest Plan's hiding cover/road density standard.

The EA's preferred alternative proposes to offer the commercial sale of any marketable timber from the thinning component of the Jimtown Project. The project area is designated as a livestock grazing area under the Helena National Forest Plan, which provides: "Timber harvest may be used as a tool

---

[12]One of the four alternatives raised but rejected by the Forest Service would have removed the commercial sale component from the proposed Jimtown Project. The other three alternatives considered but dismissed from detailed study were (1) an alternative that would not involve building a temporary road, (2) an alternative that would use another method of weed control, and (3) an alternative that would expand the proposed project. The Forest Service dismissed the no-road alternative because it concluded either the no-action alternative captured this goal or the Forest Service could alter the preferred alternative to achieve the same purpose. The Forest Service determined that the weed control and project expansion alternatives also were unreasonable. Native Ecosystems does not challenge the dismissal of these three alternatives from detailed consideration.

to improve forage production [in designated livestock grazing areas]. However, forested land is classified as unsuitable for timber management." Native Ecosystems's insistence that this designation prevents a commercial timber harvest in the Jimtown Project area is a misinterpretation of the plan, which does not prohibit commercial timber harvest on the project lands—only "timber management." "Timber management" is defined as "the purposeful growing, tending, harvesting, and regeneration of regulated crops of trees to be cut into logs, bolts or other round sections for industrial or consumer use."

[14] The Forest Service will not engage in "timber management" in the Jimtown Project area if it adopts the EA's preferred alternative. Rather, the Forest Service would be thinning to reduce fire risk; a service contractor will be permitted to sell any commercially viable small trees taken during the thinning. These actions do not amount to timber management in violation of the Helena National Forest Plan. The Forest Service persuasively points out that whether or not the preferred alternative involved a commercial sale component, the environmental impacts of the project are the same: a commercial component does not affect the project's design because the project focuses on fuels reduction and not on profitability.[13] The availability of commercial timber is simply a

---

[13]The party proposing the no commercial harvest alternative during the NEPA public comment period was concerned that a commercial sale would lead to the harvest of large trees. The Forest Service dismissed these concerns in the EA in its explanation for why it was not giving the proposed alternative detailed consideration:

> The proposal is commercial in the sense that a service contractor would have the right to remove smaller diameter trees with commercial value. The contractor would also be required to remove many trees without commercial value. The purpose and need for the project does not specify the need to produce a commercial timber sale. It is hoped that there will be sufficient value in the surplus material to help accomplish the thinning, prescribed fire, and weed treatment proposed. The guidelines for designating leave trees and trees for removal are specified in the "Stand Density Harvest Prescription" which is in the project file.

collateral benefit to the government and does not change the purpose or scope of the project. Native Ecosystems has not persuaded us that the Forest Service ignored a reasonable alternative.

Native Ecosystems also asks us to invalidate the EA because the Forest Service did not consider an alternative that would not require an amendment of the Helena National Forest Plan's hiding cover/road density standard.[14] This challenge does not make sense in the context of the Jimtown Project. The project was conceived in an effort to address the increased vegetation resulting from long-term fire suppression. The objective is to remove excess fuels and reduce the potential for large-scale fires that could ultimately wipe out any hiding cover. Increasing short-term hiding cover conditions will lead to an inevitable stand-replacing wildfire, a condition that might obliterate all hiding cover for the long term. As the Forest Service noted: "While continued exclusion of fire can allow for development of dense sapling understories and thereby provide hiding cover for a period, these conditions are clearly not sustainable over time." Consequently, the Forest Service determined that sustaining some cover over time is preferable to losing a large percentage of it in a single event. *See Akiak Native Cmty. v. U.S. Postal Serv.*, 213 F.3d 1140, 1148 (9th Cir. 2000) (observing that "it makes no sense" for the Postal Service to consider alternatives that do not promote the goal of improving efficiency when "the [agency's] purpose is to accomplish one thing.") (quoting *City of Angoon v. Hodel*, 803 F.2d 1016, 1021 (9th Cir. 1986) (per curiam)). When the purpose of the Jimtown Project is to reduce fire risk, the Forest Service need not consider alternatives that would increase fire risk.

---

[14]Native Ecosystems's suggestion also fails to recognize that the Jimtown Project area is already out of compliance with the hiding cover/road density requirements for big game under the Helena National Forest Plan. According to the DN/FONSI: "The wildlife analysis for this project concluded that even the 'no action' alternative fails to comply with the standard."

Native Ecosystems's proposed alternative also would have been redundant. The DN/FONSI makes clear that if Native Ecosystems wanted an alternative that did not involve amending the Helena National Forest Plan and moved the project area closer to compliance with the current hiding cover/road density standard, it got one—the "no action" alternative. NEPA does not require federal agencies to consider alternatives that are substantially similar to other alternatives. *See Westlands Water Dist.*, 376 F.3d at 868 ("Nor is an agency required to undertake a 'separate analysis of alternatives which are not significantly distinguishable from alternatives actually considered, or which have substantially similar consequences.' " (quoting *Headwaters, Inc. v. Bureau of Land Mgmt.*, 914 F.2d 1174, 1181 (9th Cir. 1990))).

We are not persuaded by Native Ecosystems's reliance upon *Muckleshoot Indian Tribe* to support its demand for a "no forest plan amendment" alternative. In *Muckleshoot*, we faulted the Forest Service for failing to consider "an alternative that was more consistent with its basic policy objectives than the alternatives that were the subject of final consideration." 177 F.3d at 813.

**[15]** In light of Native Ecosystems's failure to raise substantial questions that demonstrate the Jimtown Project may have a significant effect on the environment, the Forest Service's consideration of a "no action" alternative and its "preferred" alternative met its statutory and regulatory duty to prepare appropriate alternatives for the Jimtown Project EA.

## III.   NATIONAL FOREST MANAGEMENT ACT CLAIMS

NFMA creates a two-step process for the management of our national forests. *Neighbors of Cuddy Mountain I*, 137 F.3d at 1376. The Forest Service must first develop a Land Resource Management Plan ("Forest Plan") for each unit of the National Forest System. 16 U.S.C. § 1604(f)(1). For individual management actions within a forest unit, all relevant

plans, contracts, or permits must be consistent with each forest's overall management plan. *Id.* § 1604(I).

**[16]** In addition, NFMA imposes substantive requirements on the Forest Service's management of the national forests. *Neighbors of Cuddy Mountain I*, 137 F.3d at 1376. NFMA requires that forest plans "provide for diversity of plant and animal communities based on the suitability and capability of the specific land area." 16 U.S.C. § 1604(g)(3)(B). The Forest Service's NFMA regulations further require:

> Fish and wildlife habitat shall be managed to maintain viable populations of existing native and desired non-native vertebrate species in the planning area. For planning purposes, a viable population shall be regarded as one which has the estimated numbers and distribution of reproductive individuals to insure its continued existence is well distributed in the planning area. In order to insure that viable populations will be maintained, habitat must be provided to support, at least, a minimum number of reproductive individuals and that habitat must be well distributed so that those individuals can interact with others in the planning area.

36 C.F.R. § 219.19 (2000). The duty to ensure viable populations "applies with special force" to sensitive species. *Inland Empire Pub. Lands Council v. U.S. Forest Serv.*, 88 F.3d 754, 759 (9th Cir. 1996).

Native Ecosystems claims the Forest Service failed to comply with the substantive wildlife requirements of the NFMA. Specifically, Native Ecosystems claims the Forest Service failed to ensure goshawk viability, in violation of the NFMA, by failing to discuss forest-wide goshawk population trends and the impacts the Jimtown Project would have on goshawk viability and population trends.[15] The 1986 Helena National

---

[15]We do not address Native Ecosystems's NFMA arguments based on the Helena National Forest's 1994 Forest Plan Five Year Review because

Forest Plan designated goshawks as a management indicator species,[16] and the Forest Service considers the goshawk to be a "sensitive species." As a result, Native Ecosystems contends the Forest Service had a substantive duty under NFMA to ensure forest-wide goshawk viability before approving a project that would impact goshawk habitat.

Although Native Ecosystems admits that the Forest Service has monitored goshawks in the Helena National Forest for more than eight years, Native Ecosystems claims this monitoring fails to establish the existence of a *viable* population of goshawks. The record contains a 2002 Goshawk Nest Monitoring Report that chronicles goshawk sightings and goshawk nests from 1995 through 2002 in the Helena National Forest. The record also contains a 2003 chart listing goshawk sightings and nests from 1992 through 2003. On the basis of these reports, Native Ecosystems claims that there is not a viable population of goshawks in the Helena National Forest, or at least that goshawk viability cannot be presumed based on these charts. According to Native Ecosystems, the Forest Service must positively demonstrate forest-wide goshawk viability before proceeding with the Jimtown Project. *See Neighbors of Cuddy Mountain II*, 303 F.3d at 1069 ("[C]ompliance with NFMA's forest-wide species viability requirements is relevant to the lawfulness of any individual timber sale.").

In contrast, the Forest Service views its responsibility under NFMA to ensure the viability of animal species as a duty to

the Five Year Review was not part of the administrative record. *See supra* note 2.

[16]The NFMA regulations require the Forest Service to identify management indicator species that will be monitored because the species' "population changes are believed to indicate the effects of management activities." 36 C.F.R. § 219.19(a)(1) (2000). "Population trends of the management indicator species will be monitored and relationships to habitat changes determined." *Id.* § 219.19(a)(6).

ensure adequate habitat for wildlife species, not an obligation to ensure the actual viability of a species in every locale. *See* 36 C.F.R. § 219.19 (2000) ("[H]abitat shall be managed to maintain viable populations . . . ."); *see also id.* § 219.19(a)(6) ("Population trends of the management indicator species will be monitored and relationships to habitat changes determined."). Because the Forest Service concluded that the Jimtown Project will not have a significant effect on goshawk habitat, the Forest Service concludes that the project meets NFMA's species viability requirement by preserving goshawk habitat. In addition, the Forest Service contends Native Ecosystems misinterpreted the two goshawk observation charts and argues that the charts demonstrate a nearly fifty percent occupancy rate of potential goshawk home ranges.

Our case law permits the Forest Service to meet the wildlife species viability requirements by preserving habitat, but only where both the Forest Service's knowledge of what quality and quantity of habitat is necessary to support the species and the Forest Service's method for measuring the existing amount of that habitat are reasonably reliable and accurate. *Compare Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1154 (9th Cir. 1998) (holding that under the circumstances of that case the Forest Service could use habitat as a proxy for population if the Forest Service performed further analysis and showed that "no appreciable habitat disturbance" would result from the planned activity) *and Idaho Sporting Cong. v. Rittenhouse*, 305 F.3d 957, 967-68, 972-73 (9th Cir. 2002) (holding that use of habitat as a proxy for population monitoring of the management indicator species was arbitrary and capricious where record indicated that the Forest Service's habitat standard and measurements were erroneous).

We recently explained the proxy-on-proxy approach to ensuring species viability under the NFMA:

> We have, in appropriate cases, allowed the Forest
> Service to avoid studying the population trends of

the Indicator Species by using Indicator Species habitat as a proxy for Indicator Species population trends in a so-called "proxy on proxy" approach. Crucial to this approach, however, is that the methodology for identifying the habitat proxy be sound. If the habitat trend data is flawed, the proxy on proxy result, here population trends, will be equally flawed.

*Lands Council v. Powell*, 395 F.3d 1019, 1036 (9th Cir. 2005) (footnotes and internal citations omitted).

**[17]** The record does not demonstrate any flaws in the methodology used by the Forest Service to identify goshawk habitat. Both the Forest Service and Native Ecosystems endorse the habitat recommendations in the Reynolds Report as the best available science on goshawk habitat. The Forest Service's habitat analysis revealed that even if the Jimtown Project thinning area is not used by the nearby goshawk pair, there will be ample habitat available to them. A goshawk home range should contain approximately 5,400 acres of foraging habitat. The Jimtown Project will diminish the goshawk foraging habitat in the goshawk home range by approximately 480 acres (720 acres prior to the Jimtown Fire), leaving at least 6,780 acres of suitable foraging habitat in the relevant goshawk home range. The remaining foraging habitat exceeds the Reynolds Report recommendation of 5,400 acres of foraging habitat per goshawk home range. Given that the Jimtown Project area does not contain old growth forest and is designed to create an ecosystem that can support old-growth in the long-term, and given that the NEPA documents incorporate the Reynolds Report habitat recommendations, we conclude that the Forest Service satisfied NFMA's species viability requirements by demonstrating that adequate goshawk habitat is preserved.

While the Forest Service experts predict that goshawks will use the thinned area of the Jimtown Project for foraging, there

will still be sufficient foraging habitat even if the goshawks avoid the project area after thinning. The long-term benefit of preventing stand-replacing fires, which completely destroy goshawk habitat, is preferable over any short-term benefit the goshawks might receive from retaining the dense forest structure in the project area. The Forest Service considered the relevant factors and there has not been a clear error of judgment.

**[18]** Consequently, we uphold the agency action under the APA's arbitrary and capricious standard.

**AFFIRMED.**